IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| United States of America | ) | Criminal No.: 2:91-440 |
|---|---|---|
| vs. | ) | |
| Philip A. McLamb | ) | **ORDER & OPINION** |
| Petitioner/Defendant. | ) | |

This matter is before the court upon Philip A. McLamb's petition for a writ of error coram nobis. In 1992, petitioner was convicted of conspiracy and various substantive offenses arising out of his participation in the burning for hire of a Myrtle Beach, South Carolina residence so that the owner could collect the insurance proceeds. Petitioner was sentenced to a thirty-month term of imprisonment. Long ago released from custody after serving his sentence, petitioner now files the instant motion asking this court to vacate all of his convictions. The government argues that the petition should be dismissed as untimely or otherwise denied for lack of merit. For the reasons stated herein, McLamb's petition for a writ of error coram nobis is denied.

## I. BACKGROUND

The following facts are taken from petitioner's presentence investigation report and the Fourth Circuit's opinion in United States v. Vogel, 37 F.3d 1497 (4th Cir. 1994). Daniel Vogel, a businessman from Charlotte, North Carolina, hired petitioner, Larry Moore, and Charles Terry Norman to burn down his own beachfront house located at 6202 North Ocean Boulevard in Myrtle Beach, South Carolina. The government's theory

1

was that Vogel wanted his house destroyed because he had filed for Chapter 11 bankruptcy and needed the insurance proceeds to pay his creditors. Vogel's Chapter 11 reorganization plan, developed in bankruptcy proceedings during 1987, required him to make large payments to creditors which Vogel could not have afforded without the insurance proceeds.

In the summer of 1987, Vogel contacted Moore and asked him to arrange the arson of Vogel's beach house. In business with petitioner and Norman, Moore recruited the two men to help him commit the arson in exchange for $100,000, ten percent of the anticipated proceeds. On August 15, 1987, Vogel met with Moore and Norman to discuss the arson and to take the two men on a tour of his beach house in Myrtle Beach. Norman and Moore told Vogel they would burn the house to the ground using gasoline and C4 explosives. Vogel told the two men he wanted to make sure no one got hurt. Moore assured him they knew what they were doing.

In the fall, Vogel contacted Moore and told him to go ahead with the arson. It took three different attempts on three consecutive days for the successful burning of the house. The first attempt involved petitioner, Moore, and Norman. Alison Harbour was also present in South Carolina for the first attempted arson. Although Moore arranged the initial attempt, he did not accompany Norman and petitioner to the house. Notified upon his return to North Carolina that the attempt had not been successful, Norman said he would return to try again but that he did not want to go back with petitioner. That night, Norman, Blake Tilley, and Steven Lee Gregory went back to South Carolina, and Tilley and Gregory attempted the arson. After the three returned home, Norman was

notified once again that the attempt had not been successful. At that point, Gregory said he would take care of it himself. He returned to South Carolina and effectively destroyed the beach house on November 23, 1987.

After the house was destroyed, Vogel submitted claims to Aetna Casualty & Surety Co., and the insurance company proceeded to pay in installments. Aetna paid Vogel over $1.6 million under the terms of his policy.

On October 3, 1991, a federal grand jury returned a twelve count indictment against petitioner and others charging them with conspiracy and several substantive offenses stemming from the scheme to burn down Vogel's house and collect the insurance proceeds. On March 5, 1992, petitioner was convicted on all twelve counts: one count of conspiracy in violation of 18 U.S.C. § 371; five counts of mail fraud and aiding and abetting that crime in violation of 18 U.S.C. § 1341; three counts of arson and aiding and abetting that crime in violation of 18 U.S.C. § 844(i); and three counts of using fire to commit a felony and aiding and abetting that crime in violation of 18 U.S.C. § 844(h)(1). On March 10, 1993, the court sentenced petitioner to a thirty-month term of imprisonment.

Following his conviction and sentence, petitioner filed a direct appeal with the Fourth Circuit on March 25, 1993. Petitioner raised several issues in his direct appeal, including that the government failed to prove that the Vogel residence was used in an activity that affects interstate commerce as required in 18 U.S.C. § 844(i), that the evidence was not sufficient to sustain the convictions on the mail fraud counts, and that he withdrew from the conspiracy. United States v. McLamb, 25 F.3d 1042, 1994 WL

251174, at *3-4 (4th Cir. June 10, 1994). The Fourth Circuit found no merit in any of petitioner's appellate issues:

> Moore, McLamb and Gregory jointly raise two legal issues which we review de novo. First, defendants assert that the government failed to prove that the Vogel residence was used in an activity that affects interstate commerce as required in 18 U.S.C. § 844(i). The following facts were stipulated to at trial: the house was connected to interstate gas and telephone lines, Vogel had utilized materials that had moved in interstate commerce to renovate the house, an out of state bank held a mortgage on the house, the house was then being marketed for sale in several states, the house was an asset being held under the authority of the United States Bankruptcy Court in North Carolina, and at the time of the fire, the house was insured by an out of state insurance company. In <u>United States v. Ramey</u>, --- F.3d ----, ---- (4th Cir. May 17, 1994) (No. 93-5178, Slip Opinion at 6-7), we held that connection of a house to an interstate power grid constitutes a sufficient use in an activity that affects commerce to satisfy the arson statute. The government has therefore shown that the Vogel residence was used in an activity that affects interstate commerce.
>
> Appellants next challenge the sufficiency of the evidence to sustain their convictions on the mail fraud counts. We cannot disturb the verdicts if, considering the evidence in a light most favorable to the government, we conclude that any rational trier of fact could have found that the elements of the crime had been proved beyond a reasonable doubt. <u>United States v. Vogt</u>, 910 F.2d 1184, 1193 (4th Cir. 1990), cert. denied, 498 U.S. 1083 (1991). Appellants ignore the fundamental tenet of conspiracy law that a defendant is liable for the substantive crimes of his co-conspirators when those crimes are reasonably foreseeable and in furtherance of the conspiracy. <u>Pinkerton v. United States</u>, 328 U.S. 640, 647 (1946). The mail fraud clearly was both foreseeable and in furtherance of the conspiracy because the impetus of the conspiracy from the beginning was to defraud the insurance company. Thus, as co-conspirators, all of the defendants were liable for mail fraud even though they did not individually submit claims to Vogel's insurance company. See <u>United States v. Cummings</u>, 937 F.2d 941, 944-45 (4th Cir.), cert. denied, 112 S. Ct 395 (1991).
>
> Finally, McLamb claims that he withdrew from the conspiracy. He asserts that he was dismissed from the conspiracy by the affirmative act of others. However, a defendant has the burden of demonstrating withdrawal from a conspiracy by proving an affirmative act communicating the withdrawal to his co-conspirators. <u>United States v. United States Gypsum Co.</u>, 438 U.S. 422, 464 (1978). There was sufficient evidence that he remained a member

4

> of the conspiracy throughout and was entitled to a share of the insurance proceeds. Thus he did not demonstrate withdrawal and remained liable for the overt acts of his co-conspirators. See Pinkerton, 328 U.S. at 647.

Id. Petitioner then sought a writ of certiorari, which the Supreme Court denied on May 1, 1995. Moore v. United States, 514 U.S. 1102 (1995) (mem.).

Petitioner now brings his petition for a writ of error coram nobis, alleging that the federal arson statute under which he was convicted was declared unconstitutional by the Supreme Court. Specifically, petitioner is referring to his convictions under 18 U.S.C. § 844(i) (arson) and the Supreme Court's decision in Jones v. United States, 529 U.S. 848 (2000). In Jones, the Supreme Court held that an owner-occupied residence not used for any commercial purpose does not qualify as property used in interstate commerce or in any activity affecting interstate commerce within the meaning of 18 U.S.C. § 844(i). Consequently, arson of such a dwelling is not subject to federal prosecution under the statute. Jones abrogated United States v. Ramey, 24 F.3d 602 (4th Cir. 1994), a case the Fourth Circuit relied upon in rejecting petitioner's direct appeal challenge to the arson statute's interstate commerce requirement. Though the reach of Jones is limited to the arson statute, petitioner argues that the court must set aside all of his convictions in this case because "[a]ll twelve of the counts on which [he] was convicted are either directly . . . or indirectly . . . related to the now unconstitutional federal arson statute as applied to McLamb's facts." Pet. Br. 11-12.

## II. DISCUSSION

### A. Ramey I, Jones, and Ramey II

The federal arson statute reads:

5

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any *building*, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both . . . .

18 U.S.C. § 844(i) (emphases added). In United States v. Ramey, 24 F.3d 602 (4th Cir. 1994) (Ramey I ), the Fourth Circuit addressed the scope of the federal arson statute. In 1990, Ramey and another man burned down a mobile home that had been stationary for sixteen years and that was occupied by an interracial couple. In 1992, a jury convicted both men on four counts related to the arson: (1) conspiracy to deprive the couple of their civil rights, in violation of 18 U.S.C. § 241; (2) willful interference with fair housing rights, in violation of 42 U.S.C. § 3631(a); (3) use of fire in the commission of a felony, in violation of 18 U.S.C. § 844(h)(1); and (4) arson of a building used in an activity affecting commerce, in violation of 18 U.S.C. § 844(i). On appeal, Ramey argued that the application of 18 U.S.C. § 844(i) to the arson of a private residence was not permitted under the Commerce Clause. The Fourth Circuit rejected Ramey's argument and held that the residence was protected under section 844(i) because it received electricity from an interstate power grid. See Ramey I, 24 F.3d at 607 ("Though the trailer doubtless consumed but a pittance of energy from the power company's grid, its consumption, combined with that of all similarly situated buildings, has a most definite effect on interstate commerce. The class of activities not only 'affects' commerce, but is in fact the raison d'etre of an interstate business. Congress has the power to protect this commerce from destruction by fire.").

Ramey I remained the law in the Fourth Circuit until the Supreme Court decided Jones v. United States, 529 U.S. 848 (2000). In Jones, the Court held that an owner-occupied private residence not used for any commercial purpose is not property "used in" interstate commerce and that, therefore, section 844(i) does not reach such a residence. Id. at 859. In so holding, the Court rejected the Fourth Circuit's reasoning in Ramey I. See Jones, 529 U.S. at 856 ("It surely is not the common perception that a private, owner-occupied residence is 'used' in the 'activity' of receiving natural gas, a mortgage, or an insurance policy."). The Court noted that a residence serving as a home office, a rental property, or the locus of any commercial undertaking could satisfy the interstate commerce requirement of section 844(i). However, the Court concluded that,

> Were we to adopt the Government's expansive interpretation of § 844(i), hardly a building in the land would fall outside the federal statute's domain. Practically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce.

Id. at 857 (citation omitted).

In light of Jones, the Fourth Circuit reached a different result when Ramey's case returned in the 28 U.S.C. § 2255 context. Noting that the Supreme Court had specifically rejected its reasoning in Ramey I, the Fourth Circuit found that Ramey was entitled to relief. See United States v. Ramey, 217 F.3d 842 (Table), 2000 WL 790959, at *2 (4th Cir. June 20, 2000) ("We conclude that the use of electricity from an interstate power grid, like the use of gas from out-of-state sources in Jones' case, does not transform an owner-occupied private dwelling into one used in an activity affecting interstate commerce."). "Therefore, because Ramey's conduct is not prohibited by section 844(i),

7

his conviction and punishment under that section resulted in a fundamental miscarriage of justice and presents an exceptional circumstance justifying collateral relief under 28 U.S.C. § 2255." Id. Notably, however, the relief granted by the Fourth Circuit included instructions to set aside Ramey's section 844(i) conviction and resentence him, not to set aside all of Ramey's convictions. Id. at *3.

### B. Writ of Error Coram Nobis

"The writ of coram nobis is an ancient common-law remedy designed 'to correct errors of fact.'" United States v. Denedo, 129 S. Ct. 2213, 2220 (2009) (quoting United States v. Morgan, 346 U.S. 502, 507 (1954)). In federal courts, the authority to grant a writ of coram nobis is conferred by the All Writs Act, which permits "courts established by Act of Congress" to issue "all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The writ traces its origins to the King's Bench and the Court of Common Pleas, where "the office of the writ was to foster respect for judicial rulings by enabling the same court 'where the action was commenced and where the judgment was rendered' to avoid the rigid strictures of judgment finality by correcting technical errors 'such as happened through the fault of the clerk in the record of the proceedings prior to the judgment.'" Denedo, 129 S. Ct. at 2220 (quoting United States v. Plumer, 27 F. Cas. 561, 573 (No. 16,056) (CC Mass. 1859) (opinion for the court by Clifford, Circuit Justice)).

"Any rationale confining the writ to technical errors, however, has been superseded; for in its modern iteration coram nobis is broader than its common-law predecessor." Denedo, 129 S. Ct. at 2220. "In [Morgan] we found that a writ of coram

8

nobis can issue to redress a fundamental error, there a deprivation of counsel in violation of the Sixth Amendment, as opposed to mere technical errors." Id. (citing Morgan, 346 U.S. at 513). But noting a concern for finality in cases, the Court was "careful in Morgan to limit the availability of the writ to 'extraordinary' cases presenting circumstances compelling its use 'to achieve justice.'" Id. (quoting Morgan, 346 U.S. at 511). The Court also noted that the writ is limited by the tenet that an extraordinary remedy may not issue when other remedies are available. Id. (citation omitted).

The burden is on the petitioner to show that he is entitled to relief; the challenged proceedings are presumed to be correct. Morgan, 346 U.S. at 512-13. "To meet his burden, a petitioner must show that a more usual remedy is unavailable; that valid reasons exist for not attacking his conviction earlier; that adverse consequences flow from the conviction so that there exists a case or controversy; and that the error is of the most fundamental character." Scates v. United States, 914 F.2d 249 (Table), 1990 WL 135863, at *1 (4th Cir. Sep. 21, 1990) (citing Hirabayashi v. United States, 828 F.2d 591, 604 (9th Cir. 1987)).

In United States v. Mandel, 862 F.2d 1067 (4th Cir. 1988), the petitioners, who had been convicted of mail fraud and racketeering, sought writs of error coram nobis to vacate their convictions. Specifically, Mandel, the former governor of Maryland, and his co-petitioners were charged with participating in a mail fraud scheme involving gifts of clothing, jewelry and interests in land to support legislation that would benefit the Marlboro Race Track, which Mandel's co-petitioners either owned or had an interest in. Before trial, the petitioners moved to dismiss the indictment arguing that the indictment

failed to allege a cognizable scheme to defraud in that the intangible rights allegedly defrauded by the scheme did not represent "something of value" whose deprivation could be punished under the mail fraud statute. Mandel, 862 F.2d at 1069-70. The district court denied the motion, and the petitioners were convicted at trial. The petitioners promptly appealed, claiming, among other things, that their convictions under the mail fraud statute constituted an unwarranted extension of the statute and an impermissible federal intrusion into Maryland's political affairs. Their appeal was denied.

Approximately ten years after the convictions and five years after the petitioners completed service of their prison sentences, the Supreme Court decided McNally v. United States, 483 U.S. 350 (1987), holding that the mail fraud statute, 18 U.S.C. § 1341, does not protect against schemes to defraud persons of their intangible rights such as the right to honest government. Based on the Supreme Court's decision in McNally, the petitioners filed petitions for writs of error coram nobis in the district court in Maryland on August 13, 1987, to vacate their convictions and to require the government to return all fines paid and property forfeited. The district court granted the writs, vacating the petitioners' convictions and ordering that all fines be repaid. The government appealed.

The Fourth Circuit affirmed the district court, holding that coram nobis relief was "required in order to achieve justice." Mandel, 862 F.2d at 1074. The court followed the Second Circuit, which had "specifically allowed the granting of a writ of error coram nobis in light of a retroactive dispositive change in the law of mail fraud." Id. at 1075 (citing United States v. Travers, 514 F.2d 1171 (2d Cir. 1974)). Finding that coram nobis was the petitioners only remedy, the Fourth Circuit noted that the petitioners had already

served their sentences and that they had appealed their cases at each stage of the proceeding. Id. The Fourth Circuit concluded by stating,

> Petitioners were tried and convicted under § 1341 and, thus, also of prohibited racketeering activities under 18 U.S.C. §§ 1961 et seq. for acts the Supreme Court has held are not within the reach of the federal mail fraud statute. Without coram nobis relief, the petitioners, who contested their guilt at each stage of the proceeding, would face the remainder of their lives branded as criminals simply because their federal trial occurred before rather than after the Supreme Court's ruling in McNally.

Id. (citation omitted). Even though McNally affected the mail fraud statute, the court held that it was proper to vacate all of the petitioners' convictions, including the racketeering convictions, because the mail fraud offenses were the underlying offenses for the racketeering charges. Id. at 1074. Thus, the petitioners were granted full relief and, accordingly, were no longer convicted felons.

**C. McLamb's Petition**

**i. Timeliness**

As an initial matter, the government argues that petitioner's request for coram nobis relief is untimely. The government urges the court to use 28 U.S.C. § 2255 by analogy to hold petitioner to the time limit imposed by that statute. According to the government, petitioner had one year from the date Jones was decided to file his present petition. Petitioner did not file his petition until April 2009. The court finds that, under the circumstances of this case, application of the section 2255 time limits is not

appropriate.[1]  This is consistent with other cases that have looked to the petitioner's reason for delay *and* the possible prejudice to the government.

For example, in United States v. Dyer, 136 F.3d 417 (5th Cir. 1998), the Fifth Circuit stated that "[i]t has long been recognized that a petitioner seeking coram nobis must exercise 'reasonable diligence' in seeking prompt relief." Id. at 427 (citations omitted).  Other courts, including the Supreme Court, have recognized this principle. See, e.g., Morgan, 346 U.S. at 512 (requiring "sound reasons" for a petitioner's "failure to seek appropriate earlier relief"); Telink, Inc. v. United States, 24 F.3d 42, 47 (9th Cir. 1994) ("In requiring reasonable diligence at all times, our holding ensures a petitioner will not use an analogous limitations period as a safe haven for prejudicing the government, willfully delaying the assertion of his or her rights and then raising the claim after the inexcusable delay has impaired the government's ability to respond to the allegations or to proceed to retrial."); United States v. Darnell, 716 F.2d 479, 481 n.5 (7th Cir. 1983) ("The doctrine of laches adequately protects against 'sandbagging' and ensures that coram nobis relief will not be granted where a petitioner's inexcusable delay in raising his claim has prejudiced the government.").

---

[1] The government cites the court's opinion in United States v. Vogel, 2006 WL 1074899 (D.S.C. April 20, 2006), to support its contention that petitioner's coram nobis petition should be denied.  The court's disposition of Vogel's coram nobis petition is not persuasive in this case because of key differences between the two.  First, Vogel did not raise the same claim petitioner now advances, namely, the Jones/Ramey issue.  Second, Vogel had filed previous post-conviction motions.  Thus, his coram nobis petition was a subsequent attempt to relitigate claims that could have been raised in earlier proceedings.  Unlike Vogel, McLamb is raising his present issues for the first time.  McLamb and Vogel were co-conspirators, but, for purposes of their respective coram nobis petitions, that is where the similarity between the cases ends.

Here, petitioner has offered no explanation whatsoever for his nine-year delay in bringing his coram nobis petition. Jones was decided in 2000, yet petitioner waited until 2009 to seek relief. Though this delay could be deemed unreasonable, the court finds that the government would not suffer any prejudice. As the court further explains below, the Jones opinion only possibly affects petitioner's arson or attempted arson convictions under 18 U.S.C. § 844(i). And, if petitioner is correct that Jones vitiates the criminality of his actions in burning the house, then there would be no retrial, and thus no prejudice to the government. The following facts relating to the interstate commerce requirement were stipulated to at trial:

> the house was connected to interstate gas and telephone lines, Vogel had utilized materials that had moved in interstate commerce to renovate the house, an out of state bank held a mortgage on the house, the house was then being marketed for sale in several states, the house was an asset being held under the authority of the United States Bankruptcy Court in North Carolina, and at the time of the fire, the house was insured by an out of state insurance company.

McLamb, 1994 WL 251174, at *3. Based on the holding of Jones and its rationale, these facts appear insufficient to attach criminal liability to petitioner's acts related to the burning of the house.

However, Jones did not declare the statute unconstitutional on its face. Rather, there are factual scenarios under which the burning of Vogel's beach house could have been a crime under the federal statute. For example, if the house were used as a rental property or as a home office, criminal liability could attach under section 844(i). See Jones, 529 U.S. at 856 (noting that a residence serving as a home office, a rental property, or the locus of any commercial undertaking could satisfy the interstate

13

commerce requirement of section 844(i)). The parties agree that the record as it currently stands, including the presentence report, contains the facts relevant to the instant petition. The government, therefore, has agreed that the facts relating to the interstate commerce connection are those described in the Fourth Circuit's opinion. The government has not proffered any potential facts, such as the home being used as a rental property, that would take petitioner's arson convictions outside the scope of Jones. Thus, any claim of prejudice by the government rings hollow.

### ii. Petitioner's Requested Relief

Even though petitioner's request is not untimely, coram nobis relief is not appropriate because petitioner cannot achieve the relief he desires. Petitioner's requested relief is as sweeping as it is simple—he wants all of his convictions vacated. His basis for this is that the "effect of the Jones decision is that Congress was and is without constitutional power and authority to make Petitioner's conduct illegal. . . . It was this conduct that is the sole basis for Petitioner's conviction." Pet. Resp. at 7. Further, petitioner argues,

> One scans the PSR in vain for any conduct by McLamb that is not directly and closely tied to the arson. It is the arson and the arson alone that constituted McLamb's entire involvement in this matter. This is borne out by the PSR and, in fact, the government has not disputed this. Thus, but for the conduct which Congress had no authority to declare criminal, there would have been no basis to indict, try, or convict McLamb.

Pet. Resp. at 24. Petitioner ignores the true extent of his criminality, and, therefore, his request for such sweeping relief must be denied.

As an initial matter, Jones only dealt with 18 U.S.C. § 844(i), the federal arson statute. Petitioner was charged with and convicted of twelve counts, only three of which

were section 844(i) counts. The conspiracy charge, while including the arson allegations, also covered the mail fraud and using fire to commit a felony charges. A review of all twelve convictions reveals the true nature of petitioner's criminal conduct. This case was not about arson; it was about insurance fraud. In practical terms, the burning of the house was a means to an end. In legal terms, the burning constituted 1) an overt act in furtherance of the conspiracy to commit mail fraud, 2) the use of fire to commit a felony (mail fraud), and 3) a part of petitioner's conduct in aiding and abetting the substantive offense of mail fraud. The Fourth Circuit characterized petitioner's criminality as follows: "All of the convictions stem from the attempted and ultimately successful burning for hire of a residence in Myrtle Beach, South Carolina, so that the owner could receive insurance proceeds therefrom." McLamb, 1994 WL 251174, at *1. The court continued,

> Appellants ignore the fundamental tenet of conspiracy law that a defendant is liable for the substantive crimes of his co-conspirators when those crimes are reasonably foreseeable and in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 647 (1946). The mail fraud clearly was both foreseeable and in furtherance of the conspiracy because the impetus of the conspiracy from the beginning was to defraud the insurance company. Thus, as co-conspirators, all of the defendants were liable for mail fraud even though they did not individually submit claims to Vogel's insurance company. See United States v. Cummings, 937 F.2d 941, 944-45 (4th Cir.), cert. denied, 112 S. Ct 395 (1991).

Id. at *4.

Coram nobis relief should only be granted in extraordinary circumstances. In Mandel, the Fourth Circuit affirmed issuance of the writ because the petitioners stood convicted of crimes that were no longer viable under Supreme Court precedent, and that precedent required that all of the convictions be set aside. That is, the petitioners went

15

from convicted felons to citizens unhindered by the consequences of a felony conviction. As the court in Mandel recognized, "'Conviction of a felony imposes a status upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously affects his reputation and economic opportunities.'" Mandel, 862 F.2d at 1075 n.12 (quoting Parker v. Ellis, 362 U.S. 574, 593-94 (1960) (Chief Justice Warren dissenting)). The important point is that any one felony conviction will cause these hindrances.

Petitioner alleges that he "bears the burden of a federal felony conviction and all the restrains of liberty and restrictions of civil political rights that are attendant thereto." Pet. Resp. at 7. Petitioner specifically notes that his right to bear arms is denied entirely. Thus, petitioner requests relief in this case—vacating all his convictions—that will remove the restrictions on individual rights and liberties that flow from a felony conviction. What petitioner fails to grasp is that whatever legal consequences he continues to suffer from his involvement in the insurance fraud scheme cannot be remedied by issuance of the writ. All of the legal consequences petitioner presents to the court flow from a *single* felony conviction; *any* felony conviction. As the court has explained, Jones could only possibly affect petitioner's section 844(i) convictions, leaving in place nine valid felony convictions. To say that petitioner's involvement was limited to the arson is simply not true. He was convicted of other crimes that do not lose their criminal nature simply because Jones held that petitioner's conduct may not support a federal arson conviction. To put it another way, had Jones been the law of the land when petitioner and his co-conspirators burned the house, petitioner certainly could not

argue that the government would have given him a pass because the burning itself might not be considered arson under the federal statute. Such a suggestion would be absurd, as shown by the nine non-arson counts in petitioner's indictment. Those counts would be viable regardless of when Jones was decided.

      Coram nobis is an extraordinary remedy that is available only under circumstances compelling relief in order to achieve justice. Morgan, 346 U.S. at 512-13. To meet his burden to show that he is entitled to coram nobis relief, petitioner must show, among other things, that adverse consequences flow from the conviction and that the error is of the most fundamental character. Scates, 1990 WL 135863, at *1 (citing Hirabayashi, 828 F.2d at 604). The adverse consequences petitioner complains of do not flow from his arson convictions specifically; they flow from any single felony conviction. There is no question that more than one of petitioner's non-arson convictions remains valid. The justice petitioner seeks is to have his criminal record wiped clean. The court finds petitioner's request a bridge too far. Issuance of the writ in this case would constitute an empty gesture, which certainly takes the case out of the realm of those warranting extraordinary relief.

## III. CONCLUSION

For the foregoing reasons, McLamb's petition for a writ of error coram nobis is

**DENIED**.

    **AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT COURT JUDGE**

**August 13, 2010**
**Charleston, South Carolina**